# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

League of Women Voters of South Carolina, Petitioner,

v.

Thomas Alexander, in his official capacity as President of the South Carolina Senate; Murrell Smith, in his official capacity as Speaker of the South Carolina House of Representatives; and Howard Knapp, in his official capacity as Director of the South Carolina Election Commission, Respondents,

and

Henry Dargan McMaster, in his official capacity as Governor of the State of South Carolina, Respondent-Intervenor.

Appellate Case No. 2024-001227

———

## IN THE COURT'S ORIGINAL JURISDICTION

———

Opinion No. 28301
Heard June 24, 2025 – Filed September 17, 2025

———

## RELIEF DENIED

———

David Allen Chaney Jr., of the ACLU of South Carolina, of Columbia; Patrick Coleman Wooten and Charles Wilson Daniel, both of Duffy & Young, LLC, of Charleston; Theresa J. Lee and Sophia Lin Larkin, of New York, NY; and Adriel I. Cepeda Derieux, of

Washington, DC, all for Petitioner League of Women Voters of South Carolina.

Robert E. Tyson Jr., Vordman Carlisle Traywick III, La'Jessica M. Stringfellow, and Sarah Cameron Frierson, all of Robinson Gray Stepp & Laffitte, LLC, of Columbia, and John M. Gore and Benjamin P. Daus, both of Washington, DC, for Respondent Senate President Thomas C. Alexander; Mark Carroll Moore and Michael Antonio Parente, of Columbia, and Andrew A. Mathias, of Greenville, all of Maynard Nexsen PC, for Respondent G. Murrell Smith Jr.; in his official capacity as Speaker of the South Carolina House of Representatives; and Mary Elizabeth Crum, Tracey Colton Green, Michael Reid Burchstead, and Benjamin Roper Jenkins IV, all of Burr & Forman LLP, of Columbia, and Thomas Wells Nicholson, of the State Election Commission, of Columbia, for Respondent Howard Knapp, in his official Capacity as Director of the South Carolina Election Commission.

Chief Legal Counsel Thomas Ashley Limehouse Jr., Senior Litigation Counsel & Chief Deputy Legal Counsel William Grayson Lambert, Deputy Legal Counsel Erica Wells Shedd, and Deputy Legal Counsel Tyra S. McBride, all of the Office of the Governor, of Columbia, for Respondent-Intervenor Henry D. McMaster as Governor of the State of South Carolina.

Joshua Snow Kendrick, of Kendrick & Leonard, P.C., of Greenville, for the Brennan Center for Justice at New York University School of Law and Professor Robert F. Williams Amici Curiae.

Armand G. Derfner, of Derfner & Altman, LLC, of Charleston; Annabelle E. Harless, of Chicago, IL; and Benjamin Phillips, of Washington, DC, for the Campaign Legal Center Amicus Curiae.

———————

**JUSTICE JAMES:** "Partisan gerrymandering is the practice of dividing a geographical or jurisdictional area into political units or election districts to give a particular political party or group 'a special advantage.'" *Harper v. Hall*, 384 N.C. 292, 299, 886 S.E.2d 393, 400 (2023). As the Supreme Court of the United States has noted, this practice in the United States dates back to 1789. *Rucho v. Common Cause*, 588 U.S. 684, 696-97 (2019) ("During the very first congressional elections, George Washington and his Federalist allies accused Patrick Henry of trying to gerrymander Virginia's [congressional] districts against their candidates—in particular James Madison, who ultimately prevailed over fellow future President James Monroe.") (citing Thomas R. Hunter, *The First Gerrymander?*, 9 EARLY AM. STUDIES 781, 811 (2011)). The term "gerrymander" was not coined until 1812, when the Massachusetts legislature, controlled by the Democratic-Republican party, passed a bill setting state senatorial district lines to the advantage of that party. Governor Elbridge Gerry, perhaps reluctantly, signed the bill into law. One of the senatorial districts was supposedly shaped like a salamander, and the practice of drawing arguably irregularly-shaped district lines became known as a "Gerry-mander."[1]

Petitioner League of Women Voters of South Carolina asks this Court to strike down the South Carolina General Assembly's 2022 congressional redistricting plan (the "Plan"), 2022 Act No. 118 (S.865), codified as S.C. Code Ann. § 7-19-45 (Supp. 2024). The League contends the Plan is an "extreme partisan gerrymander" in contravention of several provisions of the South Carolina Constitution. The League contends the Plan (1) denies voters their "equal right to elect officers" in violation of article I, section 5 (Free and Open Elections Clause); (2) intentionally dilutes the electoral influence of voters of a disfavored political party in violation of article I, section 3 (Equal Protection Clause); (3) intentionally suppresses the electoral influence of certain voters based on their viewpoints and prior voting history in violation of article I, section 2 (Free Speech Clause); and (4) violates the alleged mandate of article VII, sections 9 and 13 that districts be drawn with the aim of

---

[1] Smithsonian Magazine, https://www.smithsonianmag.com/history/where-did-term-gerrymander-come-180964118/ (last visited Sept. 11, 2025). Gerry, who signed the Declaration of Independence and served two terms in the U.S. House of Representatives before becoming governor, lost his bid for re-election as governor in 1812; however, he was elected that year as James Madison's vice president and served in that office until his death in 1814. National Archives Prologue Magazine, https://www.archives.gov/publications/prologue/2006/spring/gerry.html (last visited Sept. 11, 2025).

keeping counties whole. The League requests declaratory and injunctive relief, specifically that the Court (1) rule partisan gerrymandering violates the South Carolina Constitution; (2) strike down the Plan; (3) enjoin future congressional elections under the Plan; (4) and order the General Assembly to draw a new congressional redistricting plan respecting the South Carolina Constitution. We hold the League's partisan gerrymandering claim presents a nonjusticiable political question and dismiss the League's claims with prejudice.

## I.

Congressional districts within a state must have, as nearly as practicable, populations equal to one another.[2] South Carolina has seven congressional districts. Districts 1 and 6 are adjacent to each other. The 2020 census revealed District 1 to be overpopulated by 87,689 residents and District 6 to be underpopulated by 84,741 residents. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 12 (2024). To regain the required population balance, South Carolina had to modify its districting map. The disputed portion of the Plan mainly involves changes to District 1 and District 6. Senator Chip Campsen spearheaded the mapmaking process, *id.* at 14, and his map became Senate Amendment 1 and then Senate Bill 865 (S.865). Governor McMaster signed S.865 into law in January 2022. S.865 is now codified at S.C. Code Ann. § 7-19-45. The 2022 and 2024 elections proceeded under the Plan.

In 2024, the Supreme Court of the United States analyzed the Plan in the context of racial gerrymandering and held a three-judge panel of the United States District Court for the District of South Carolina erroneously found considerations of race predominated in the Plan. *See Alexander*, 602 U.S. at 7. In that case, the South Carolina State Conference of the NAACP and South Carolina District 1 voter

---

[2] Article I, § 2 of the United States Constitution provides "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." In *Wesberry v. Sanders*, the United States Supreme Court held this provision "means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." 376 U.S. 1, 7-8 (1964). The Court concluded that "those who framed the Constitution meant that, no matter what the mechanics of an election, whether statewide or by districts, it was population which was to be the basis of the House of Representatives." *Id.* at 8-9.

Taiwan Scott challenged the Plan, alleging it resulted in unconstitutional racial gerrymandering in certain districts and diluted the electoral power of black voters. *Id.* at 15. The Supreme Court noted the South Carolina "Republican-controlled legislature . . . made it clear that it would aim to create a stronger Republican tilt in District 1[,]" and it noted Senate Majority Leader Shane Massey testified before the District Court that "partisanship was 'one of the most important factors' in the process and that the Republican Party was 'not going to pass a plan that sacrificed [District 1].'" *Id.* at 13. A nonpartisan staffer and cartographer, Will Roberts, relied on political data from the 2020 presidential election and drew various maps upon request for both Republican and Democratic senators. *Id.* He also received input from Representative James E. Clyburn, "whose recommendations would have preserved the strong Democratic tilt in his district (District 6) . . . ." *Id.* at 13-14. Multiple floor discussions and hearings open to public input were held on various maps—including maps submitted by the League.

The Supreme Court summarized how the Plan differed from the 2011 map in three important respects, all of which reflected the legislature's priorities:

> First, the Enacted Plan unified Beaufort and Berkeley Counties within District 1. This move enhanced the Republican advantage in District 1 because the moved-in portions of those counties leaned Republican. Second, to further increase the Republican lead in District 1, Roberts also put more of Dorchester County in District 1. These changes exacerbated the population imbalance between District 1 and District 6. Third, to cure this problem, Roberts moved a series of precincts in Charleston from District 1 to District 6. In keeping with the legislature's partisan objectives, the precincts moved out of District 1 had a 58.8% Democratic vote share.

*Id.* at 14. The Plan divided Charleston between Districts 1 and 6, which the Supreme Court noted "was seen as in Charleston's best interests because it meant that the county would have two Representatives in the House—one Democrat, Representative Clyburn, who has represented District 6 since 1993 and has held important House leadership positions, and one Republican representing District 1." *Id.* The Supreme Court quoted Republican Senator Chip Campsen, who stated "I am tickled to death that Jim Clyburn represents Charleston County," because "Clyburn has more influence with the Biden Administration perhaps than anyone in the nation." *Id.* The Supreme Court also explained the Plan "achieved the legislature's political goal by increasing District 1's projected Republican vote share by 1.36% to 54.39%." *Id.* at 15.

The Supreme Court noted partisan objectives explained why the legislature chose to split Charleston and other counties. *Id.* at 21. The Court explained the "State claims it sought to ensure that District 1 had a reliable Republican majority, and simply removing 88,000 voters without regard to their party preferences would not have satisfied that objective. Similarly, the high priority that the legislature gave to its partisan goal provides an entirely reasonable explanation for the subordination of other objectives such as the avoidance of county splits." *Id.* The Court held there was no direct evidence supporting the District Court's finding that race predominated in the design of District 1 and "[t]he circumstantial evidence falls far short of showing that race, *not partisan preferences*, drove the districting process . . . ." *Id.* at 33 (emphasis added); *see also id.* at 25 ("The fact of the matter is that politics pervaded the highly visible mapmaking process from start to finish."). The Court concluded the evidence showed the legislature's primary goal in drawing the Plan was to increase the advantage of the Republican Party in elections, not to engage in gerrymandering along racial lines.

Five years before *Alexander*, the Supreme Court held in *Rucho v. Common Cause* that federal law does not furnish judicially discernible and manageable standards for reviewing claims of partisan gerrymandering (as opposed to racial gerrymandering), thus rendering such claims nonjusticiable under the United States Constitution. 588 U.S. at 718. Relying upon *Rucho*, the *Alexander* Court held the partisan gerrymandering issue arising from the Plan was likewise nonjusticiable under the U.S. Constitution. 602 U.S. at 6 ("Legislators are almost always aware of the political ramifications of the maps they adopt, and claims that a map is unconstitutional because it was drawn to achieve a partisan end are not justiciable in federal court. Thus, as far as the Federal Constitution is concerned, a legislature may pursue partisan ends when it engages in redistricting.").

The Supreme Court remanded the case to the District Court for further proceedings on the plaintiffs' remaining vote dilution claim. *Id.* at 38-39. However, the plaintiffs voluntarily dismissed that claim. Shortly thereafter, the League filed with this Court a Petition for Original Jurisdiction and Complaint naming as respondents Thomas Alexander, President of the South Carolina Senate; Murrell Smith, Speaker of the South Carolina House of Representatives; and Howard Knapp, Executive Director of the South Carolina Election Commission.[3] Governor Henry

---

[3] There is no South Carolina government agency known as the "South Carolina Election Commission." Instead, South Carolina Code section 7-3-10 (Supp. 2024) establishes the "State Election Commission." The State Election Commission (SEC)

D. McMaster moved to intervene. We granted the Petition for Original Jurisdiction and the Governor's motion to intervene.

## II.

"[T]he General Assembly's authority to legislate is plenary: the South Carolina Constitution grants power to the legislature to 'enact any act it desires to pass, if such legislation is not expressly prohibited by the Constitution of this state, or the Constitution of the United States.'" *Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 475, 892 S.E.2d 121, 127 (2023) (quoting *Heslep v. State Highway Dep't*, 171 S.C. 186, 193, 171 S.E. 913, 915 (1933)). "[S]tatutes are presumed constitutional[, and t]hat presumption is a weighty one and can be overcome only by a showing of unconstitutionality beyond a reasonable doubt." *Id*. at 476, 892 S.E.2d at 127. A facial challenge is "the most difficult to mount successfully" because a petition must show the law "is unconstitutional in all its applications." *Id.* at 477, 892 S.E.2d at 128 (quoting *State v. Legg*, 416 S.C. 9, 13-14, 785 S.E.2d 369, 371 (2016)).

## III.

*Rucho v. Common Cause* is a logical starting point for our analysis of the League's claims. In *Rucho*, plaintiffs in North Carolina and Maryland challenged their states' congressional redistricting maps as unconstitutional partisan gerrymanders. 588 U.S. at 689-90. The North Carolina plaintiffs complained the State's districting plan discriminated against Democrats; the Maryland plaintiffs complained their State's plan discriminated against Republicans. *Id.* at 690. The Supreme Court observed both plans were "highly partisan, by any measure." *Id.* at 691. The plaintiffs alleged the gerrymandering violated the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Elections Clause, and Article I, § 2, of the United States Constitution. *Id.* at 690.

The *Rucho* Court explained it has identified political question cases in the past as those that lack "judicially discoverable and manageable standards for resolving [them]," and that, therefore, the question before the Court was whether there was an "'appropriate role for the Federal Judiciary' in remedying the problem of partisan gerrymandering—whether such claims are claims of *legal* right, resolvable according to *legal* principles, or political questions that must find their resolution elsewhere." *Id.* at 696. The Court noted "[p]artisan gerrymandering is nothing new"

is an administrative agency of the executive branch responsible for overseeing elections and voter registration.

and the practice goes back to the colonies prior to independence. *Id.* Noting partisan gerrymandering claims have been difficult for the Supreme Court to adjudicate because a jurisdiction is permitted to engage in constitutional political gerrymandering, the Court observed the "'central problem' is not determining whether a jurisdiction has engaged in partisan gerrymandering" but instead "determining when political gerrymandering has gone too far." *Id.* at 700-01 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 296 (2004)). The Court further noted partisan gerrymandering claims "ask the courts to make their own political judgment about how much representation particular political parties *deserve*—based on the votes of their supporters—and to rearrange the challenged districts to achieve that end." *Id.* at 705. The Court recognized this type of judgment is a policy choice and is not the kind of "clear, manageable, and politically neutral" standard required for justiciable issues. *Id.* at 707.

The *Rucho* Court held the text of the federal Constitution and its amendments do not supply workable standards for federal courts to police the role partisanship plays in redistricting. *See id.* at 718 ("We conclude that partisan gerrymandering claims present political questions beyond the reach of the federal courts. Federal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions."). The Supreme Court explained partisan gerrymandering claims present questions about how to "apportion political power as a matter of fairness," despite the fact that "[t]here are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral." *Id.* at 705, 707. The Court further noted "the one-person, one-vote rule is relatively easy to administer as a matter of math[,]" but "[t]he same cannot be said of partisan gerrymandering claims, because the Constitution supplies no objective measure for assessing whether a districting map treats a political party fairly." *Id.* at 708. Because courts "have no commission to allocate political power and influence in the absence of a constitutional directive or legal standards to guide us in the exercise of such authority," the *Rucho* Court held partisan gerrymandering claims are nonjusticiable. *Id.* at 721.

The *Rucho* Court also underscored it has "never struck down a partisan gerrymander as unconstitutional—despite various requests over the past 45 years" and that "[t]he expansion of judicial authority would not be into just any area of controversy, but into one of the most intensely partisan aspects of American political life." *Id.* at 718-19. However, the Court noted this "conclusion [does not] condemn complaints about districting to echo into a void" but rather, "[p]rovisions in state

statutes and state constitutions can provide standards and guidance for state courts to apply." *Id.* at 719.

The League latches onto the "state statutes and state constitutions" language in *Rucho* and asks this Court to hold certain provisions of the South Carolina Constitution supply judicially discoverable and manageable standards for adjudicating partisan gerrymandering claims.

## IV.

Before we venture into the League's four claims, we emphasize the constraints placed on a properly functioning judicial branch when faced with a nonjusticiable political question. Article I, § 8 of the South Carolina Constitution provides:

> In the government of this State, the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other.

S.C. Const. art. I, § 8. "The nonjusticiability of a political question is primarily a function of the separation of powers." *Segars-Andrews v. Jud. Merit Selection Comm'n*, 387 S.C. 109, 121, 691 S.E.2d 453, 460 (2010) (quoting *S.C. Pub. Interest Found. v. Jud. Merit Selection Comm'n*, 369 S.C. 139, 142, 632 S.E.2d 277, 278 (2006) ("SCPIF")). "The fundamental characteristic of a nonjusticiable 'political question' is that its adjudication would place a court in conflict with a coequal branch of government." *Id.* at 121-22, 691 S.E.2d at 460 (quoting *SCPIF*, 369 S.C. at 142-43, 632 S.E.2d at 278). Therefore, "the courts will not rule on questions that are exclusively or predominantly political in nature rather than judicial." *Id.* at 122, 691 S.E.2d at 460 (citing *SCPIF*, 369 S.C. at 143, 632 S.E.2d at 278).

"In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 198 (1962)). In determining whether a question is political and nonjusticiable, "the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations." *Id.* (quoting *Coleman v. Miller*, 307 U.S. 433, 454-55 (1939)). The principles we outlined in *Segars-Andrews* and *SCPIF* track the Supreme Court's rationale in *Rucho* that political question cases identified by the Supreme Court are

those that lack "judicially discoverable and manageable standards for resolving [them]." *Rucho*, 588 U.S. at 696 (quoting *Baker*, 369 U.S. at 217).

Of course, if a legislative enactment is alleged to be unconstitutional, we cannot dodge the question of constitutionality by hiding behind a "political question" excuse—we must determine whether the enactment passes constitutional muster. "[T]his Court is duty bound to review the actions of the Legislature when it is alleged in a properly filed suit that such actions are unconstitutional." *Segars-Andrews*, 387 S.C. at 123, 691 S.E.2d at 460-61. "While '[a]ll considerations involving the wisdom, policy, or expediency of an act are addressed exclusively to the General Assembly[,] . . . when the unconstitutionality of an act is clear to this court, beyond a reasonable doubt, then it is its plain duty to say so." *Id.* at 123, 691 S.E.2d at 461 (quoting *Elliott v. Sligh*, 233 S.C. 161, 103 S.E.2d 923 (1958)); *see also Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221 (1986) (stating the political question doctrine, which derives from the separation of powers doctrine, excludes from judicial review those controversies that revolve around policy choices and value determinations constitutionally committed for resolution to the halls of state legislatures or to the confines of the executive branch). "A court must conduct a limited examination of the matter when it is argued a non-justiciable political question is presented." *Alexander v. Houston*, 403 S.C. 615, 619, 744 S.E.2d 517, 520 (2013).

Therefore, we will analyze the provisions of the South Carolina Constitution raised by the League and determine whether (1) any provision pertains to partisan gerrymandering and (2) if so, whether the Plan violates such provision. To that end, we will determine whether any of these constitutional provisions provide "satisfactory criteria" or "judicially discoverable and manageable standards" for adjudicating claims of partisan gerrymandering in South Carolina.

## V.

The South Carolina Constitution vests in the Legislature the sole authority to draw congressional districts. Article VII, section 13 provides: "The General Assembly may at any time arrange the various Counties into Judicial Circuits, and into Congressional Districts, including the County of Saluda, as it may deem wise and proper." S.C. Const. art. VII, § 13. Article II, section 10 requires that the General Assembly "regulate the time, place[,] and manner of elections, provide for the administration of elections and for absentee voting . . ." and "enact other provisions necessary to the fulfillment and integrity of the election process." Therefore, redistricting is textually committed solely to the Legislature, and the League so concedes.

The *Rucho* Court noted "[t]he States . . . are actively addressing the issue" of partisan gerrymandering "on a number of fronts," and acknowledged that "[p]rovisions in state statutes and state constitutions can provide standards and guidance for state courts to apply." 588 U.S. at 719. The *Rucho* Court also noted "numerous . . . States are restricting partisan considerations in districting through legislation," some "by placing power to draw electoral districts in the hands of independent commissions," others by "outright prohibit[ing] partisan favoritism in redistricting." *Id.* at 719-20. Indeed, a minority of states have prohibited, or simply addressed, partisan favoritism in redistricting in their constitutions or statutes. *See, e.g.*, Cal. Const. art. XXI, § 2(e) ("The place of residence of any incumbent or political candidate shall not be considered in the creation of a map. Districts shall not be drawn for the purpose of favoring or discriminating against an incumbent, political candidate, or political party."); Colo. Const. art. V, § 44 (creating independent commission with goal of prohibiting political gerrymandering); Del. Code Ann. tit. 29, § 804 (providing that in determining district boundaries for the state legislature, no district shall "be created so as to unduly favor any person or political party"); Fla. Const. art. III, § 20(a) ("No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent."); Haw. Const. art. 4, § 6 ("No district shall be so drawn as to unduly favor a person or political faction."); Iowa Code § 42.4(5) ("No district shall be drawn for the purpose of favoring a political party, incumbent legislator or member of Congress, or other person or group."); Mo. Const. art III, § 3 ("Districts shall be drawn in a manner that achieves both partisan fairness and, secondarily, competitiveness[.] . . . 'Partisan fairness' means that parties shall be able to translate their popular support into legislative representation with approximately equal efficiency."); Mont. Code Ann. § 5-1-115(3) ("A district may not be drawn for the purposes of favoring a political party or an incumbent legislator or member of congress."); N.Y. Const. art. III, § 4(c)(5) ("Districts shall not be drawn to discourage competition or for the purpose of favoring or disfavoring incumbents or other particular candidates or political parties."); Ohio Const. art. XIX, § 1(C)(3)(a) (prohibiting redistricting plans that "unduly favor[] or disfavor[] a political party or its incumbents"); Or. Rev. Stat. Ann. § 188.010(2) ("No district shall be drawn for the purpose of favoring any political party, incumbent legislator or other person."); Va. Const. art. II, § 6-A (creating redistricting commission with representation from both political parties); Wash. Const. art. II, § 43(5) ("The commission's plan shall not be drawn purposely to favor or discriminate against any political party or group.").

Unlike the foregoing minority of states, New Hampshire, North Carolina, and Kansas have no constitutional provisions or statutes addressing partisan

redistricting, and the highest courts in those states have followed the *Rucho* Court's reasoning—partisan gerrymandering claims are not justiciable when there are no judicially discoverable and manageable standards for adjudicating such claims. In *Brown v. Sec'y of State*, 176 N.H. 319, 329, 313 A.3d 760, 768 (2023), the Supreme Court of New Hampshire held "the New Hampshire Constitution contains a textually demonstrable commitment to redistrict to the legislature" and "the plain text of the specific provisions invoked by the plaintiffs . . . contains no judicially discernible and manageable standards for adjudicating claims of extreme partisan gerrymandering."

In a 2023 decision addressing partisan gerrymandering, the Supreme Court of North Carolina put it succinctly:

> It is not within the authority of this Court to amend the constitution to create such limitations on a responsibility that is textually assigned to another branch. Furthermore, were this Court to create such a limitation, there is no judicially discoverable or manageable standard for adjudicating such claims [and] creating partisan redistricting standards is rife with policy decisions. Policy decisions belong to the legislative branch, not the judiciary. . . . [W]e hold that partisan gerrymandering claims present a political question that is nonjusticiable under the North Carolina Constitution.

*Harper v. Hall*, 384 N.C. 292, 300, 886 S.E.2d 393, 400-01 (2023).

Similarly, the Kansas Supreme Court recently held:

> [W]e conclude that until such a time as the Legislature or the people of Kansas choose to follow other states down the road of limiting partisanship in the legislative process of drawing district lines, neither the Kansas Constitution, state statutes, nor our existing body of caselaw supply judicially discoverable and manageable standards[.] . . . We hold that the question presented is nonjusticiable as a political question, at least until such a time as the Legislature or the people of Kansas choose to codify such a standard into law.

*Rivera v. Schwab*, 315 Kan. 877, 906, 512 P.3d 168, 187 (2022).

The League claims the Plan is unconstitutional under four separate provisions of the South Carolina Constitution—(1) the Free and Open Elections Clause, S.C. Const. art. I, § 5; (2) the Equal Protection Clause, S.C. Const. art. I, § 3; (3) the Free

Speech Clause, S.C. Const. art. I, § 2; and (4) S.C. Const. art. VII, §§ 9 & 13, which the League refers to as the "whole-county directive."

As we will now discuss, like New Hampshire, North Carolina, and Kansas, South Carolina has no statutes or constitutional provisions that pertain to, prohibit, or limit partisan gerrymandering. The absence of such provisions is fatal to the League's claim.

## A.     Free and Open Elections Clause, S.C. Const. art. I, § 5

First, the League argues the Free and Open Elections Clause, S.C. Const. art. I, § 5, prohibits partisan gerrymandering. The Free and Open Elections Clause provides:

> All elections shall be free and open, and every inhabitant of this State possessing the qualifications provided for in this Constitution shall have an equal right to elect officers and be elected to fill public office.

S.C. Const. art. I, § 5.

The Court has not often been asked to interpret this Clause, and never in the context of gerrymandering. However, the League contends *Cothran v. W. Dunklin Pub. Sch. Dist. No. 1-C*, 189 S.C. 85, 200 S.E. 95 (1938), *State v. Huntley*, 167 S.C. 476, 166 S.E. 637 (1932), and *Gardner v. Blackwell*, 167 S.C. 313, 166 S.E. 338 (1932), stand for the proposition that the South Carolina Constitution "prohibits legal manipulations that would curb voters' right to an equal say in their government based on partisan grounds." Respondents contend these 1930s cases are readily distinguishable from the issue of partisan gerrymandering because each case involved a law that actually deprived a voter of the right to cast a ballot. We agree with Respondents.

In *Gardner*, Republican candidates for federal offices challenged the "custom and practice" of providing voters with two general election ballots—one with Republican candidates and the other with Democratic candidates, which the petitioners argued destroyed the secrecy of the ballot. 167 S.C. at 316-17, 166 S.E. at 339. We held restricting ballot access to Republican and Democratic candidates violated "the free exercise of the right to suffrage" because it denied voters "who are not members of the Democratic or Republican parties, such as [third-party] and independent voters, the free exercise of the right of suffrage in this State." *Id.* at 325-26, 166 S.E. at 342. *Gardner*, while dealing with an election issue, did not implicate or include a discussion of the Free and Open Elections Clause. Furthermore, *Gardner* is distinguished from the present case because the Plan does

not deny voters of any political party the right to vote.

In *Huntley*, we held a state law allowing the elections of school board members "according to the rules applicable to primary elections" was unconstitutional. 167 S.C. at 476, 166 S.E. at 639. Based on the rules for primary elections at the time, application of the law would deprive voters of the right to vote if they were not affiliated with a political party. We struck down the law under the Free and Open Elections Clause, holding the use of primary election rules—which imposed additional qualifications on voters beyond those contained in the Constitution—would unconstitutionally deny politically affiliated voters the "equal right to elect officers." *See id.* at 483, 166 S.E. at 639-40 ("It is clear that the act will deprive all those citizens of a school district of the right to vote in such election who do not have their names upon the club roll of some political party as required by the regulations applicable to the conducting of primary election, although they possess the qualifications of suffrage required by the Constitution."). *Huntley* is of no help to the League, as the Plan does not exclude from voting individuals who belong to a certain political party.

In *Cothran*, the petitioners challenged a state statute allowing the issuance of school bonds upon a majority vote of "only such electors as return real or personal property for taxation and who exhibit their tax receipts and registration certificate." 189 S.C. at 86, 200 S.E. at 95. We held the statute was unconstitutional, noting "[t]he Constitution does not . . . anywhere provide" that a voter "must be the owner of property, real or personal." *Id.* at 87, 200 S.E. at 96. We further stated:

> Under [the Free and Open Elections Clause,] the right to vote, as the words expressly state, must be maintained absolutely free, and the vote of every elector must be granted equal influence with that of every other elector. To be free means that the voter shall be left in the untrammeled exercise, whether by civil or military authority, of his right or privilege; that is to say, no impediment or restraint of any character shall be imposed upon him either directly or indirectly whereby he shall be hindered or prevented from participation at the polls. As otherwise expressed, an election is free and equal within the meaning of the Constitution when it is public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him.

*Id.* at 90, 200 S.E. at 97 (quoting 9 R.C.L., § 8, p. 984). We held that because the statute "adds to the law" regarding eligibility of voting, it "deprives voters . . . of their constitutional rights of suffrage." *Id.* at 90, 200 S.E. at 96-97.

The League bends *Cothran* to support the proposition that all voters have a right to equal political influence on the outcome of elections. We disagree. We interpret the Free and Open Elections Clause, in conjunction with *Cothran*, to mean the Clause is satisfied when every voter has an unhindered opportunity to cast a ballot free from intimidation, every voter gets one vote, and each voter has an "equal influence with that of every other elector." *See Cothran*, 189 S.C. at 90, 200 S.E. at 97. The Plan does not prevent any voter from casting a ballot, and each vote is counted and weighed the same.

The South Carolina Free and Open Elections Clause protects an individual's right to vote, but it does not create a right for political parties or their dedicated voters to have their chosen candidates win. Respondent Alexander contends that "[i]f the Clause did convey a right to voters' preferred electoral outcomes, South Carolina courts would be called upon to review *every* redistricting plan—and *every election*—across the State to ensure that every voter's equal right to his or her preferred 'partisan outcome' has been upheld." *See also Harper*, 384 N.C. at 344-45, 886 S.E.2d at 427 (warning against adopting a process that would "involve endless litigation that would task our judges with ensuring that the political makeup of every city council, county commission, or local board of education adequately reflected the distribution of Republicans and Democrats in the corresponding locality"). We agree and hold South Carolina's Free and Open Elections Clause does not prohibit or limit partisan gerrymandering. Our adoption of the League's interpretation of the Free and Open Elections Clause would necessarily lead to an abjectly unworkable court-sponsored standard.

**B.     Equal Protection Clause, S.C. Const. art. I, § 3**

Second, the League contends South Carolina's Equal Protection Clause, S.C. Const. art. I, § 3, prohibits partisan gerrymandering. South Carolina's Equal Protection Clause provides:

> The privileges and immunities of citizens of this State and of the United States under this Constitution shall not be abridged, nor shall any person be deprived of life, liberty, or property without due process of law, nor shall any person be denied the equal protection of the laws.

S.C. Const. art. I, § 3.

The South Carolina Equal Protection Clause provision requires "that all persons be treated alike under like circumstances and conditions, both in privileges conferred and liabilities imposed." *Planned Parenthood S. Atl. v. State*, 438 S.C. 188, 240, 882 S.E.2d 770, 798 (2023) ("*Planned Parenthood I*") (Beatty, C.J., concurring) (quoting *Doe v. State*, 421 S.C. 490, 504, 808 S.E.2d 807, 814 (2017)). "To succeed, an equal protection claim must have a showing that similarly situated persons receive disparate treatment." *Id.* Statutes purportedly infringing upon fundamental rights, such as the right to vote, are subject to "heightened" scrutiny. *See Sojourner v. Town of St. George*, 383 S.C. 171, 176, 679 S.E.2d 182, 185 (2009). To the extent this "heightened" scrutiny is the same as strict scrutiny, the government must show the law "meet[s] a compelling state interest and [is] narrowly tailored to effectuate that interest." *Planned Parenthood I*, 438 S.C. at 237, 882 S.E.2d at 796 (Beatty, C.J., concurring) (quoting *In re Treatment and Care of Luckabaugh*, 351 S.C. 122, 140-41, 568 S.E.2d 338, 347 (2002)). The League acknowledges the Court may disagree that allegations of partisan gerrymandering trigger strict scrutiny, and if so, the League suggests the Court should adopt and apply the less-stringent three-part test used by the New Mexico Supreme Court in *Grisham*, as Justice Kagan proposed in her dissent in *Rucho*. *See Grisham v. Van Soelen*, 539 P.3d 272, 289 (N.M. 2023) (quoting *Rucho*, 588 U.S. at 735 (Kagan, J., dissenting) ("As many legal standards do, that test has three parts: (1) intent; (2) effects; and (3) causation.")).

We need not delve into the specifics of the test proposed by Justice Kagan or otherwise determine what level of scrutiny to apply to the League's equal protection claim, because the League has not made the threshold showing that "similarly situated persons receive disparate treatment" under the Plan. *See Planned Parenthood I*, 438 S.C. at 240, 882 S.E.2d at 798 (Beatty, C.J., concurring). The Plan does not restrict a qualified elector's right to vote or prevent elections from being held, nor does it lead to vote dilution, as every voter in each congressional district still has one vote, and each vote counts the same in our evenly-populated districts. We hold the Plan does not violate the South Carolina Equal Protection Clause.

## C.    Free Speech Clause, S.C. Const. art. I, § 2

Third, the League contends partisan gerrymandering is prohibited by South Carolina's Free Speech Clause:

> The General Assembly shall make no law respecting an establishment of religion or prohibiting the free exercise thereof, *or abridging the freedom of speech* or of the press; or the right of the people peaceably

to assemble and to petition the government or any department thereof for a redress of grievances.

S.C. Const. art. I, § 2 (emphasis added). The League argues the Plan dilutes the electoral power of certain voters because of the political viewpoints and party affiliations expressed by their ballots.

We hold South Carolina's Free Speech Clause does not pertain to, limit, or prohibit partisan gerrymandering. Congressional redistricting is not a speech restriction, and here, the speech of neither the League nor its members—or any voters, for that matter—has been restricted by the Plan. In South Carolina, the Free Speech Clause has never been interpreted to apply to a gerrymandering claim. The *Rucho* Court rejected such a claim, and several other state courts have rejected partisan gerrymandering claims under their states' free speech clauses. *See Rucho*, 588 U.S. at 713-14 (holding there were no restrictions on speech, association, or any other First Amendment activities in the districting plans at issue, and the plaintiffs were free to engage in those activities no matter what the effect of a plan may be on their district); *Graham v. Adams*, 684 S.W.3d 663, 688 (Ky. 2023) ("Quite simply, the [apportionment plans] do not in any way limit the ability of the people to freely communicate their thoughts and opinions or otherwise speak, nor to assemble or associate for political purposes. The people remain entirely free to engage in such activities regardless of where the General Assembly has set the district boundaries."); *Brown*, 176 N.H. at 337, 313 A.3d at 774 (rejecting a free speech challenge to a districting plan because "[t]he reasoning employed [in *Rucho*] in determining whether there is a judicially discernible and manageable standard for resolving claims of partisan gerrymandering under the Federal Constitution is directly on point with respect to the plaintiffs' claims under the New Hampshire Constitution," including their free speech claim); *Harper*, 384 N.C. at 369, 886 S.E.2d at 443 ("Partisan gerrymandering plainly does not place any restriction upon the espousal of a particular viewpoint . . . . [O]pponents of a redistricting plan are free to voice their opposition."); *Rivera*, 315 Kan. at 892, 512 P.3d at 179 ("*Any line drawing*, even one that violates equal protection guarantees, does not infringe on a stand-alone right to vote, the right to free speech, or the right to peaceful assembly.").

## D. S.C. Const. art. VII, §§ 9 & 13

Fourth and finally, the League contends the congressional redistricting plan violates article VII, section 9 and article VII, section 13 of the South Carolina Constitution by "needlessly splitting counties to serve base partisan goals." The Plan splits ten counties (Charleston, Colleton, Dorchester, Florence, Greenville, Jasper,

Orangeburg, Richland, Spartanburg, and Sumter), with parts of those counties being in different districts than the other parts.

Article VII, Section 9 provides:

Each County shall constitute one election district, and shall be a body politic and corporate.

Article VII, Section 13 provides:

The General Assembly may at any time arrange the various Counties into Judicial Circuits, and into Congressional Districts, including the County of Saluda, as it may deem wise and proper, and may establish or alter the location of voting precincts in any County.

The League contends these provisions reflect a constitutional commitment to preserving county boundaries. The League acknowledges there are times when this preference must yield to other principles, such as ensuring congressional districts are approximately equal in population; however, it argues counties should not be split unless there is a good reason, and it claims partisan gain is not a valid reason for splitting ten counties.

Nothing in article VII, section 13 or article VII, section 9 addresses partisan gerrymandering or prohibits county splits in congressional redistricting. Nor is there any case law interpreting either provision to pertain to partisan gerrymandering. The League, while conceding some county splits are appropriate, proposes no guidelines or standards for the Court to consider in determining how many county splits are permissible, what counties may be split, or how they should be split, and the League does not address how a court can possibly weigh competing considerations as to whether there is a good reason for a county split. We hold the Plan is not unconstitutional under either section.

## VI.

In addition to our review of the League's constitutional claims, we are mindful of the following statement of the *Rucho* Court when it noted the drawing of maps cannot account for how human nature impacts a voter's decision to vote for a particular candidate in a given election:

Even the most sophisticated districting maps cannot reliably account for some of the reasons voters prefer one candidate over another, or why their preferences may change. Voters elect individual candidates

in individual districts, and their selections depend on the issues that matter to them, the quality of the candidates, the tone of the candidates' campaigns, the performance of an incumbent, national events or local issues that drive voter turnout, and other considerations. Many voters split their tickets. Others never register with a political party, and vote for candidates from both major parties at different points during their lifetimes. For all of those reasons, asking judges to predict how a particular districting map will perform in future elections risks basing constitutional holdings on unstable ground outside judicial expertise.

588 U.S. at 712-13. This statement, borne of common sense and practical reality, resonates with us.

There are no constitutional provisions or statutes that pertain to, prohibit, or limit partisan gerrymandering in the congressional redistricting process in South Carolina. There are no judicially discernible or manageable standards or satisfactory criteria to adjudicate partisan gerrymandering claims. Therefore, we hold partisan gerrymandering claims present a nonjusticiable political question in South Carolina, and we deny the League's claim for relief.

**RELIEF DENIED.**

**FEW and VERDIN, JJ., concur. KITTREDGE, C.J., concurring in a separate opinion, in which HILL, J., concurs.**

**CHIEF JUSTICE KITTREDGE:**  From the earliest days of our nation's founding, it has been understood both that gerrymandering is driven by partisan politics, and that some level of gerrymandering is permissible under our Constitution.  As a result, state legislatures have not always rigorously drawn their respective congressional district lines in accordance with their own precise political makeup.  To the contrary, over last two centuries, it has become increasingly customary for a state legislature to draw its congressional district lines to disproportionately favor the political party in power at the time.  Nonetheless, until recently, state legislatures typically drew their respective congressional district lines in a manner so as to give some sense of proportional representation to the minority party, collectively recognizing there was some limit on their power to redraw district boundaries.  For most, the prospect of a federal constitutional challenge provided a safeguard to the minority political party, preserving some semblance of fair representation in Congress and cautioning state legislatures against employing a winner-take-all approach in drawing congressional district lines.

However, the federal delineation of an Article III case-or-controversy requirement[4] versus a nonjusticiable, purely political question proved elusive in the gerrymandering context.  Indeed, when such cases arose, the United States Supreme Court and the lower federal courts struggled mightily to impose consistent legal standards to the issues presented, resulting in frustration for the Bench, the Bar, and the public as a whole.  Eventually, the conflict came to a head in *Rucho v. Common Cause*, in which the Supreme Court ruled, in a sharply-divided 5-to-4 opinion, that partisan gerrymandering claims presented nonjusticiable political questions beyond the reach of the United States Constitution.  588 U.S. 684, 721 (2019).  *Rucho* ushered in a new day.

Following *Rucho*'s elimination of any possibility of a federal constitutional violation, state legislatures became emboldened, as any possible check on a state's exercise of legislative authority was limited to that particular state's constitution and laws.  *See id.* at 719 ("Provisions in state statutes and state constitutions can provide standards and guidance for state courts to apply.").  Necessarily then, in any subsequent gerrymandering challenge, a state supreme court will be limited to reviewing the law from its own state alone.[5]  Such a narrow perspective inevitably precludes a state's

---

[4] U.S. Const. art. III, § 2.

[5] For example, as the majority correctly sets forth, the South Carolina Constitution grants the legislature broad authority to establish or alter congressional district lines at any time so long as the legislature deems such an action "wise and proper."

supreme court from considering the full consequences of gerrymandering decisions in other states. As a result, we are seeing—and will continue to see—state legislatures race to further minimize and perhaps erase the representation of the state's minority political party in Congress. These results may, indeed, be in line with each respective state's constitution and laws, but they collectively have the effect of diminishing our constitutional republic as a whole. This is a troubling prospect for those who adhere to our nation's founding principle that the People are sovereign.[6] We can expect the current trend to continue unless the United States Supreme Court steps back into the fray. *See Vieth v. Jubelirer*, 541 U.S. 267, 312 (2004) (Kennedy, J., concurring) ("[I]f courts refuse to entertain any claims of partisan gerrymandering, the temptation to use partisan favoritism in districting in an unconstitutional manner will grow.").

With these observations in mind, and applying the South Carolina Constitution to this legal challenge, I have no hesitation in concurring with the majority opinion, and I commend Justice James for his well-reasoned opinion. I agree that Petitioner's specific claims here are not justiciable under constitutional and legal standards in South Carolina and the record before us. I do not, however, read the Court's decision as creating a categorical rule that all future claims of excessive partisan gerrymandering are beyond judicial review. I construe today's decision as cautious judicial deference, not indifference. It remains conceivable that a future challenge may present more fully developed constitutional violations with a discernable nexus to manageable judicial standards, thereby warranting judicial intervention. *See, e.g.*, *id.* at 313 (noting advancements in technology "may produce new methods of analysis that make more evident the precise nature of the burdens gerrymanders impose on the representational rights of voters and parties," which in turn "would facilitate court efforts to identify and remedy the burdens, with judicial intervention limited by the derived standards").

Today's decision will invariably attract praise and criticism from all corners of the political spectrum. To those on either side of the debate, I point to the constitutional bedrock of this nation: the sovereign power of the People to shape legislative

S.C. Const. art. VII, § 13 ("The General Assembly may at any time arrange the various Counties into . . . Congressional Districts . . . as it may deem wise and proper . . . .").

[6] To its credit, the South Carolina legislature has drawn our congressional district lines to virtually ensure the current minority political party has representation in Congress, unlike some other states.

outcomes through advocacy and the ballot box, a principle more fully explained by James Madison in *The Federalist No. 10*.  Our judicial constraint today in no way muffles the People's voice in shaping the laws that govern us.

**HILL, J., concurs.**